654 S.E.2d 280

**The STATE, Respondent,**

**v.**

**John Boyd FRAZIER, Appellant.**

**No. 4310.**

Court of Appeals of South Carolina.

Heard Oct. 11, 2007.

Decided Nov. 8, 2007.

Rehearing Denied Dec. 20, 2007.

Appellate Defender Katherine Hudgins, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, and Assistant Deputy Attorney General Donald J. Zelenka, all of Columbia; and Solicitor John Gregory Hembree, of Conway, for Respondent.

STILWELL, J.

John Boyd Frazier appeals his convictions for murder and armed robbery claiming the court erred in admitting certain statements of his co-conspirator and in denying his motions for directed verdict on both charges. We affirm in part and reverse in part.

## FACTS

Frazier was tried for the murder and armed robbery of William Brent Poole, the husband of Frazier's paramour, Renee Poole.[1]  Brent was murdered while he and Renee walked along the shore at Myrtle Beach on the night of June 9, 1998.[2]  Officer Scott Brown of the Myrtle Beach Police Department testified that while on beach patrol in his truck the night of the murder he was approached by Renee.  Brown testified that Renee told him, "my husband has been shot." After briefly examining the scene and realizing Brent had in fact been shot, Brown escorted Renee back to his truck and radioed dispatch.  As he did so, Renee "kept touching her chest and saying 'we were robbed.'"  As he was talking to dispatch, Brown asked Renee to describe the killer.  She told him the suspect was wearing all black clothes and a ski mask and had instructed them to lie face down on the beach

The trial judge had initially agreed to allow the testimony regarding Renee's statements at the scene over Frazier's objection that the statements were testimonial in nature, and Renee was not available for cross-examination.  However, upon reconsideration the trial judge determined the testimony regarding all of Renee's statements except "my husband has been shot" should be stricken from the record.  The trial judge then offered a curative instruction to the jury, and the trial proceeded.

The State called Donna and Mark Hobbes who testified that as they exited the Carolina Winds Motel to go for a walk on the beach the night of the murder, they noticed a man they later described as being "suspicious."  Mark testified that the man stared at them, and he stared back until the man turned and moved quickly in the direction of the beach.  Donna testified that she noticed the man because he was running and

---

1.  This is Frazier's second trial on these charges.  The South Carolina Supreme Court reversed and remanded Frazier's original conviction because certain expert evidence was not admitted and certain unreliable, hearsay statements by a co-worker were admitted.  *State v. Frazier,* 357 S.C. 161, 592 S.E.2d 621 (2004).

2.  The parties were all residents of Winston–Salem, North Carolina.  Brent and Renee had come to Myrtle Beach to celebrate their wedding anniversary.

because he had on dark, heavy clothing that seemed inappropriate for the weather. As the Hobbeses walked toward the beach access point, which consisted of a short boardwalk and steps down to the strand, Donna saw the man again crouched behind the motel. The man then stood and looked straight at the couple so that both the Hobbeses were able to see his face. They testified the man then ran in the general direction of the beach but toward an area where there was heavy vegetation rather than the clear, sandy portion of the beach. The couple later, both in independent photographic lineups and in court, identified Frazier as the "suspicious" man. Both indicated they were confident in their identification.

Frazier's supervisor testified that the week prior to the murder, Frazier had requested June 8, 9, and 10 off from work. Frazier offered no alibi for the night of the murder other than telling officers he was home alone sick. Captain William Frontz testified that pursuant to a search warrant copies of a day planner were discovered at Frazier's home. The day planner contained a notation on June 9: "Renee and Brent." Other writing was above that notation but had been marked out. Bruce Wolford, a friend of Frazier, testified that Frazier hated Brent and the control he exercised over Renee by virtue of their sharing a young daughter. Wolford also testified that Renee and Frazier were together at Wolford's home during the time period before the murder when Renee and Frazier were allegedly no longer romantically involved. Wolford overheard the pair discussing the fact that Renee and Brent were planning a trip to the beach. Renee and Brent's neighbor, James Bollow, testified that a black Chevrolet Blazer, the vehicle he had seen Frazier in previously, had been at the Poole home during Brent's work hours and during the days leading up to the murder.

It was further shown that Frazier had previously owned a gun that could not be excluded as the murder weapon.[3] Frazier could not account for the whereabouts of the gun, indicating he had sold it at a gun show. The State also showed that Frazier had borrowed a vehicle from a friend the

---

3. The murder weapon was never discovered, but through ballistics analysis of the fired bullets the State's forensic expert could determine that the murder weapon was likely one of a list of 38 guns.

day before the murder and returned it the day after the murder. Frazier told that same friend upon returning the vehicle that Brent had been "shot and killed" even though Frazier's contact with police to that point had not involved any discussion of Brent having been shot.

Finally, the State presented the testimony of Howard Sirles who testified that he discovered Brent's soaking wet wallet on July 5 in his yard located across the road from the beach area that contained the murder scene.[4] Officer David Blubaugh testified the wallet contained Brent's driver's license, $9 cash, two ATM cards, photographs, and other miscellaneous items.

## LAW/ANALYSIS

### I. Testimony of Officer Brown

Frazier contends the trial judge erred in admitting, through the testimony of Officer Brown, Renee's statement "my husband has been shot." We disagree. Before delving into a lengthy *Crawford*[5] analysis, it becomes apparent that the propriety of the trial judge's ruling on this issue is not preserved for our review. The trial judge initially allowed testimony regarding Renee's statements to Officer Brown immediately after the murder finding them to be non-testimonial. After reconsidering the issue, the trial judge informed the jury that all statements other than "my husband has been shot" would be stricken from the record and could not be considered as evidence. The attorneys and the trial judge agreed this was an acceptable way for this matter to be dealt with, and Frazier offered no objection even after the judge read the verbatim curative instruction she planned to give the jury. In order to preserve such an issue for our review where a curative instruction was offered, an appellant must make a contemporaneous objection to the sufficiency of the instruction or make a motion for mistrial. *State v. Walker*, 366 S.C. 643, 658–59, 623 S.E.2d 122, 130 (Ct.App.2005). In this instance, the curative instruction specifically allowed for the inclusion of

---

4. Sirles' prior deposition testimony was read into the record because he was unable to attend the trial due to health problems.

5. *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

the statement "my husband has been shot." Not having objected to that portion of the curative instruction, nor having moved for a mistrial, Frazier cannot now claim error in the admission of the statement.

## II. Denial of Directed Verdict Motion—Murder

When reviewing the denial of a directed verdict, this court must view the evidence and all reasonable inferences in the light most favorable to the state. *State v. Weston*, 367 S.C. 279, 292, 625 S.E.2d 641, 648 (2006). If there is any direct evidence or substantial circumstantial evidence reasonably tending to prove the guilt of the accused, an appellate court must find the case was properly submitted to the jury. *Id.* at 292–93, 625 S.E.2d at 648. "When the state relies exclusively on circumstantial evidence and a motion for directed verdict is made, the circuit court is concerned with the existence or nonexistence of evidence, not with its weight." *State v. Cherry*, 361 S.C. 588, 594, 606 S.E.2d 475, 478 (2004). The court should grant a directed verdict motion when the evidence presented merely raises a suspicion of guilt. *Id.* " 'Suspicion' implies a belief or opinion as to guilt based upon facts or circumstances which do not amount to proof. However, a trial judge is not required to find that the evidence infers guilt to the exclusion of any other reasonable hypothesis." *Id.* (citations omitted).

In this instance, the State built its murder case out of numerous pieces of circumstantial evidence coupled with the identification of the Hobbeses. Testimony regarding Fraziers ongoing, adulterous relationship with Renee and hatred of Brent provided evidence of motive. The prosecution presented evidence that the relationship continued up until the time of Brents murder, even though Renee and Frazier were supposedly no longer a couple.

Testimony about Frazier asking for time off from work and his lack of a corroborated alibi on the night in question was evidence of opportunity. In addition, there was testimony that Renee and Frazier discussed the beach trip and that the date of the trip was indicated on Fraziers calendar with the notation, "Renee and Brent." Furthermore, a friend of Fraziers testified that Frazier borrowed a car for the three-day

period around the time of the murder. Upon returning the car to his friend, Frazier stated that Brent had been shot. The source of his knowledge of that information is not revealed in the record, but the record shows he had not been informed by police that Brent had been shot.

The State offered evidence that Frazier had the means to commit the murder in that he owned a gun that could have been the murder weapon. Finally, there is the Hobbeses unwavering testimony placing Frazier at Renee and Brents hotel and close to the murder scene at the relevant time. This is in contrast to Fraziers claim to police that he had not been to Myrtle Beach in four years. Taken together, these things amount to more than a mere suspicion Frazier committed the crime. It was within the jurys province to determine if the evidence established proof of guilt beyond a reasonable doubt, and they concluded that it did. We conclude the trial judge did not err in denying Fraziers motion for directed verdict.

### III. Denial of Directed Verdict Motion—Armed Robbery

"Robbery is defined as the felonious or unlawful taking of money, goods, or other personal property of any value from the person of another in his presence by violence or by putting such person in fear." *State v. Parker*, 351 S.C. 567, 570, 571 S.E.2d 288, 289 (2002) (overruled on other grounds by *State v. Gentry*, 363 S.C. 93, 610 S.E.2d 494 (2005)). Armed robbery occurs when a person commits a robbery while armed with a deadly weapon, while using a representation of a deadly weapon, or while using an object the victim reasonably believed was a deadly weapon. S.C.Code Ann. § 16–11–330(A) (Rev.2003).

We have reviewed the record for evidence to support the trial courts denial of Fraziers directed verdict motion on the armed robbery charge. While there admittedly is evidence that could support a robbery charge, we do not believe the evidence rises above the level of creating a mere suspicion that Frazier committed an armed robbery. Pooles wallet was discovered in Mr. Sirles yard almost a month after the murder, with no fingerprints or any evidence to connect it to Frazier. The contents of the wallet appeared to be intact. A wedding ring was found in the sand near Brents body, but

there is no testimony in the record to identify that ring as belonging to the deceased.[6]

Had Renees statements to Officer Brown indicating a robbery had been committed been allowed, we would be presented with an altogether different analysis. However, absent those statements, or any substantial circumstantial evidence connecting Frazier to an armed robbery of Brent Poole, we are left to merely speculate how the wallet found its way to Mr. Sirles yard. The meager facts and circumstances the jury was left to rely upon do no more than create a mere suspicion of guilt. A directed verdict motion should be granted when the evidence presented merely raises a suspicion of guilt. Therefore, the trial courts denial of Fraziers motion for a directed verdict on the charge of armed robbery was error.

For all of the foregoing reasons, the decision of the trial court is

**AFFIRMED IN PART AND REVERSED IN PART.**

SHORT and WILLIAMS, JJ., concur.

---

**6.** In the State's closing argument the solicitor characterizes the wedding ring as belonging to Brent, and there is no objection from Frazier. We cannot, however, ascertain in the record any direct testimony identifying the ring as belonging to Brent.